FILED IN CHAMBERS
U.S.D.C. Rome

MAY 10 2007

JAMES N. HATTEN, Clerk
By: _____
            Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLOUGH MARKETING SERVICES,
INC.,

        Plaintiff,

    v.

THE MAIN LINE CORPORATION, NOE
SANTAMARINA, CAROLEE
SANTAMARINA, and BERGER
SINGERMAN, P.A.,

        Defendants.

CIVIL ACTION

NO. 1:07-CV-0173-RLV

O R D E R

This is a tort action arising out of a bankruptcy proceeding
in the United States Bankruptcy Court for the Southern District of
Florida.  Pursuant to a settlement stipulation and an order by that
court, the plaintiff, Clough Marketing Services ("CMS"), was
supposed to receive approximately $522,000[1] as a secured creditor
of the defendant, the Main Line Corporation ("Main Line").
However, Main Line apparently never made its promised payment, and
the plaintiff filed the instant action alleging a myriad of tort
claims.  Pending before the court is a Motion to Dismiss [Doc. No.

---

[1]The First Amended Complaint [Doc. No. 16] alleges that the
settlement stipulation delineated $522,056.99 as the precise amount
owed to CMS, but the Bankruptcy Court's order and the parties'
briefs list the amount owed as $522,007.  Consequently, the precise
amount at issue is now unclear, but the parties will have an
opportunity to clarify it at a later time.   For now, this court
will refer to the secured claim amount as $522,000.

20] by Main Line and its two corporate officers, Noe Santamarina and Carolee Santamarina ("the Main Line defendants"). Also pending is a Motion to Dismiss [Doc. No. 19] by the other defendant, Berger Singerman, P.A., the law firm that served as bankruptcy counsel for Main Line.  For the foregoing reasons, the Mainline Defendants' Motion is DENIED, and Berger Singerman's Motion is GRANTED.

## Factual Background

Main Line is a Florida corporation engaged in the sale and servicing of computer software that facilitates the automation of official record keeping systems.  Noe Santamarina was the sole shareholder and owner of Main Line and served as its President and Chief Technology Director. His sister, Carolee Santamarina, served as Main Line's Secretary and Chief Project Manager.  Around early 1994, Walter Clough began working for Main Line as a representative and consultant, largely responsible for procuring many lucrative contracts with various governmental entities.[2]

In 1999, Main Line terminated its relationship with Clough and his company, CMS.  Clough believed that he was owed unpaid compensation for his work procuring contracts, however, and

---

[2]Although Walter Clough initially billed for his services through  Clough Management Consultants, Inc. ("CMC"), he later changed to CMS, Clough Marketing Services, for reasons not relevant here.

initiated a suit against Main Line and Noe Santamarina. To represent him in that matter, Clough hired the law firm of Richelo, Morrissey & Wright, P.C. ("RMW"). After he later retained new counsel, a dispute arose over attorney fees owed by Clough to RMW; consequently, RMW filed an attorney's lien against CMS. At this point, the history of this action takes many confusing turns. Without recounting the tortured details here, it suffices to note that by 2004 Clough and CMS had obtained a verdict against Main Line, which led to CMS filing a garnishment action, and naming Wachovia Bank as the garnishee, to recover the $522,000 owed by Main Line.

Subsequently, in January 2005, Main Line filed for bankruptcy in the Southern District of Florida ("the bankruptcy case"). Related to that action, Main Line also initiated an adversary proceeding ("the adversary proceeding") against CMS to recover the $522,000 deposited in Wachovia Bank on behalf of the Main Line bankruptcy estate. RMW was added as a party to the adversary proceeding based on its claim against CMS for unpaid fees. Thus, there were effectively two proceedings in the bankruptcy court: the bankruptcy case and the adversary proceeding. The bankruptcy case dealt with Clough's motion for administrative expenses and permission to file a late proof of claim and Main Line's motion for

sanctions against Clough regarding his motions.   The adversary proceeding, on the other hand, dealt with Main Line's seeking to avoid the CMS garnishment and to recover the money deposited in Wachovia Bank for the benefit of its own bankruptcy estate.   In other words, the issue in the adversary proceeding was whether Main Line owed $522,000 to CMS and RMW and, if so, how it should be divided between them.

On November 28, 2005, in the adversary proceeding, Main Line entered into a settlement agreement with RMW, which was approved by the bankruptcy court, and it prescribed that any distribution eventually made to CMS "shall be held in a segregated, interest bearing account" pending the determination of rights as between RMW and CMS/Clough.   [November 28, 2005, Order, Doc. No. 16, Ex. A.] Accordingly, distribution of the money owed by Main Line would be according to whatever scheme  CMS/Clough and RMW agreed upon.

On January 30, 2006, in the bankruptcy action, the court granted Main Line's motion for summary judgment, which was affirmed by the District Court on November 2, 2006.  With presumably few remaining issues in the bankruptcy action, the parties entered into a settlement agreement on December 11, 2006, and resolved to release all claims against each other. [December 11, 2006,

4

Stipulation for Compromise and Settlement, Doc. No. 20-3, Ex. A ("December 11 Agreement").]

On March 29, 2006, in the adversary proceeding, Main Line and CMS entered into a settlement agreement and stipulated that Main Line would pay CMS $522,000 as a secured claim, [Stipulation for Compromise and Settlement Between Main Line and CMS/Clough, Doc. No. 16, Ex. B], and the court approved that settlement on May 2, 2006 [May 2, 2006, Order, Doc. No. 16, Ex. C].  The bankruptcy court also entered a Confirmation Order confirming Main Line's Chapter 11 plan on April 26, 2006, and then closed the case pursuant to a post-confirmation status conference on October 23, 2006.  Thus, by the end of March 2006, the amount of money owed by Main Line had been determined, but the rights as between CMS and RMW were still unresolved.

Those issues were eventually decided, though, in December 2006, when CMS and RMW entered into an agreement allocating their interest in Main Line's distribution.  Accordingly, CMS and RMW sent a letter to Main Line directing it to distribute the money that had been ordered to be held in a separate, segregated account by the bankruptcy court in the November 28, 2005, Order.  However, Main Line advised CMS that in fact it did not have any money left to pay its agreed upon debt.

Shortly thereafter, CMS filed the instant action against the Main Line defendants for breach of fiduciary duty, fraud, conversion, unjust enrichment, civil conspiracy, and fraudulent conveyances, as well as punitive damages.  Berger Singerman represented Main Line in the bankruptcy action, and the claims against it are based on the representations it made on behalf of Main Line.  The Main Line defendants and Berger Singerman both move this court to dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted and for lack of personal jurisdiction.

**THE MAIN LINE DEFENDANTS' MOTION TO DISMISS**

Main Line, Noe Santamarina, and Carolee Santamarina, assert that dismissal of the complaint is proper for several reasons: (1) a forum selection clause in the December 11 settlement agreement requires any dispute between the parties to be resolved by a Florida court; (2) the plaintiff's claims are barred by the Florida litigation privilege because they are all related to judicial proceedings that occurred in Florida; (3) the plaintiff's claims are properly brought only before the bankruptcy court; (4) the plaintiff's claims are essentially based on a contractual dispute and are thus not actionable in tort; (5) the plaintiff's claims are

insufficiently pled; (6) the court lacks personal jurisdiction over Noe Santamarina and Carolee Santamarina.

<u>The Forum Selection Clause</u>

The Main Line defendants' assertion that the forum selection clause in the December 11 Agreement prevents this case from being litigated in this forum is based on Rule 12(b)(3), improper venue, and this court's discretion to transfer or dismiss a civil case pursuant to 28 U.S.C.A §§ 1404, 1406. <u>See</u> <u>Lipcon v. Underwriters at Lloyd's, London</u>, 148 F.3d 1285, 1289-90 (11th Cir. 1998). Accordingly, this court reviews the forum selection clause to determine whether the parties have previously agreed to pursue the claims at issue in this case in another forum.

At first blush, the defendants' argument appears persuasive. They note that the December 11, 2006, Stipulation and Compromise Settlement between CMS and Main Line provides, "[A]ny dispute[] relating to this Stipulation shall be commenced in a court of competent jurisdiction located in Florida." [Doc. No. 20-3, Ex. A. 7.] Moreover, in a section titled, "Broad Interpretation of Releases," the parties expressly agreed to "resolve and release each other from any and all matters between them, whether existing in the past, present or arising in the future." Thus, the December 11 Agreement between CMS and the Main Line defendants would appear

7

to limit proper venue for the present dispute between the parties to a court in Florida.

However, the Main Line defendants' arguments attempt to gloss over pertinent facts that significantly affect the application of the forum selection clause contained within the December 11 Agreement. Foremost, the December 11 Agreement itself makes clear that it is an agreement to resolve the claims in the bankruptcy case, not the adversary proceeding.  As this court previously noted, the bankruptcy case involved administrative claims, whereas the adversary proceeding involved the disposition of the $522,000. Consequently, the forum selection clause contained within the December 11 Agreement applies only to disputes relating to the bankruptcy administrative claims and not the payment of the $522,000, which is what gives rise to the plaintiff's claims here.

Further, the defendants cited only a portion of the section titled "Broad Interpretation of Releases," and failed to include the patently relevant exclusion at the end of that section: "the Parties desire and resolve to release each other from any and all matters between them . . . _other_ _than_ those obligations subject of the Adversary Stipulation and Plan" [December 11 Agreement (emphasis in original)].  Accordingly, the parties' agreement to release each other from "all matters between them" was exclusive of

8

the dispute in the adversary proceeding and the distribution of the $522,000--which is precisely the issue in this case.   Therefore, the forum selection clause in the December 11 Agreement is not applicable to this matter, and venue in this court is proper.

<u>The Florida Litigation Privilege</u>

The Main Line defendants assert that they have absolute immunity from the state law claims against them because of the Florida litigation privilege.   Florida law provides for immunity from all tort claims based on "any act occurring during the course of a judicial proceeding . . . so long as the act has some relation to the proceeding."   <u>Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. U.S. Fire</u>, 639 So. 2d 606, 608 (Fla. 1994).   The Main Line defendants argue that because all of the claims against them are based on conduct that at the very least "has some relation" to the bankruptcy proceeding, which occurred in Florida, the litigation privilege applies.

For support, the defendants point to the plaintiff's allegations that the defendants knowingly submitted a false affidavit to the bankruptcy court, that Main Line falsely represented it would place the money in a separate, segregated account, that the defendants converted the money to their own use, and that they fraudulently conveyed to others the funds that were

9

supposed to be paid to the plaintiffs.   Thus, according to the defendants, because each allegation of wrongful conduct has "some relation" to the underlying bankruptcy proceeding in Florida, they have immunity from damages based on that conduct.

However, as the plaintiff points out, there is a distinction to be made between tortious conduct that occurs *during* a proceeding and that which occurs *afterwards*.   The acts that the plaintiff alleges were tortious occurred after the parties had settled the adversary proceeding.   While it may be true that the plaintiff, at least in part, alleges "false statements" made to or filed with the bankruptcy court in relation to the adversary proceeding, it is also true that those statements occurred only in order to comply with certain conditions of the settlement agreements and orders of the bankruptcy court that had already taken place.   They were not actions taken during the adversary proceeding in furtherance of the defendants' position, but rather they were actions taken after the issues in that matter, namely the disposition of the $522,000 had been settled.   Thus, the allegedly false statements and other tortious conduct was not a part of any adjudication of the parties' rights or interests or liability for damages.

In <u>Levin</u>, the Florida Supreme Court noted that originally the purpose of the litigation privilege was to balance two competing

10

interests: the right to enjoy a reputation unimpaired by defamation, and the right to full disclosure of facts during a judicial proceeding. 639 So. 2d at 608. Accordingly, immunity was initially limited to "anything said or written during litigation," such as slander or libel. Id.

However, the court in Levin expanded the privilege after being presented with a new issue that did not concern the oral or written conduct of one of the parties, but rather the actions taken by one party in the defense of its case. There, the defendant, an insurer, had been sued by its insured for failing to settle a personal injury action within the limits of its policy. The insured's supplemental insurance carrier retained the law firm of Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell to represent it in a bad faith action against the primary insurer. During discovery, the supplemental carrier listed one of the attorneys for the Levin firm as a person who had knowledge of the defendant's bad faith. Thereafter, the defendant certified to the court that it would be calling that particular Levin attorney as a witness and moved to disqualify the entire Levin firm as counsel, which was granted. At trial, however, the attorney was never called to testify. Subsequently, the Levin firm sued the defendant for tortious interference with a business relationship alleging that

11

the defendant intentionally acted to prevent the Levin firm from representing its client in that suit by listing its attorney as a witness and then never calling him to testify.  The defendant asserted the Florida litigation privilege and, consequently, the Florida Supreme Court was presented with the issue of whether the litigation privilege extended to protect tort claims other than just libel or slander.

Answering that question in the affirmative, the court held that the Florida litigation privilege extended to all acts, not just anything said or written during litigation, "so long as the act has some relation to the proceeding."  Levin, 639 So. 2d at 608.  In so doing, and significant for determining the application of the privilege to this case, the Florida Supreme Court reasoned, "Just as participants in litigation must be free to engage in unhindered communication, so too must those participants be free to use their best judgment in prosecuting or defending a lawsuit without fear of having to defend their actions in a subsequent civil action for misconduct."  Thus, the determination of whether to apply the litigation privilege is properly focused on the purpose and timing of the misconduct, i.e., whether the conduct was

in furtherance of the party's defense of prosecution of the lawsuit.[3]

In a more recent case, the Florida Supreme Court again squarely addressed the scope of the litigation privilege.    In Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole, 950 So. 2d 380 (Fla. 2007), the court examined whether to expand the privilege to statutory violations as well as common-law torts.  In that case, the court outlined the focus and underlying rationale for the privilege:

> [T]he policy reasons for adopting a rule of immunity for actions taken in judicial proceedings focus on the judicial nature of the proceedings, not whether they were initiated under common law or statute.   It is the perceived necessity for candid and unrestrained communications in those proceedings, free of the threat of legal actions predicated upon those communications, that is at the heart of the rule.

Echevarria, 950 So. 2d at 384.  The court decided to expand the privilege to include statutory claims because the rationale announced in Levin was equally applicable regardless of the cause

---

[3]Indeed, when examining the scope of the litigation privilege in Fridovich v. Fridovich, 598 So. 2d 65, 66 (Fla. 1992), the Florida Supreme Court noted that the privilege "*arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceeding or as necessarily preliminary thereto.*" (emphasis in original)(quoting Ange v. State, 123 So. 916, 917 (Fla. 1929).

of action, "[p]articipants be free to use their best judgement in prosecuting or defending a lawsuit."   Id.

Accordingly, the Florida Supreme Court has made clear that the litigation privilege is applicable to nearly all conduct that occurs during a proceeding, so long as it has some relation to that proceeding.  However, the court has not extended the privilege to conduct that occurs *after* a proceeding is over or, more importantly, to conduct that is required by a court order.

In this case, the allegedly tortious conduct occurred *after* the parties had settled the adversary proceeding and, although it was arguably related, in fact it was merely conduct that was a condition of the settlement agreements.  The settlement agreements had already been approved, and, consequently, the rights and obligations had already been established. The breach of fiduciary duty, fraud, and conversion claims are based on representations and statements made by the Main Line defendants that they had complied with certain terms of the settlement agreements.   That allegedly tortious conduct was not part of a judicial proceeding in which the defendants required freedom to exercise their "best judgment in prosecuting or defending a lawsuit."

Here, the Main Line defendants had already defended their lawsuit, the damages had been affixed, and their obligation to

14

distribute the money had been established.   Consequently, even though their actions may have "some relation to the proceeding," they occurred well after the time in which the litigation privilege was meant to apply.   A party is given very broad parameters with which to litigate its case, but a party is not given free rein to deceive a court or the opposition regarding its compliance with an agreement.

The Florida Supreme Court's reasoning in Levin and Echevarria, and the holdings themselves, make clear that simply "relating to" the judicial proceeding is not enough.   The allegedly tortious conduct must have been taken to prosecute or defend the lawsuit, and that did not occur in this case.   The defendants' actions giving rise to these claims had nothing to do with their prosecution or defense of the bankruptcy case or the adversary proceeding.   Accordingly, this court concludes that the Florida litigation privilege does not provide absolute immunity to the Main Line defendants' actions.[4]

---

[4]Of course, in determining that the Florida litigation privilege does not apply in this case, the court has presumed that the plaintiff's state law claims are based on Florida law.   In their briefs, the parties do not squarely address the issue of whether Florida or Georgia law applies--the defendants cite to Florida law and the plaintiff cites to Georgia law--and it is an issue they would do well to address in the future.   In any event, this court need not reach that issue here because even if the

## The Plaintiff's Claims Before the Bankruptcy Court

The Main Line defendants assert that the bankruptcy court retained jurisdiction over any dispute arising out of the proceedings before it.  The plaintiff asserts, though, that the claims in this case are "unrelated" to the bankruptcy and adversary proceedings, and so the matter is properly before this court.

A bankruptcy court properly has jurisdiction over a suit only when the matters before it are "core" bankruptcy proceedings, or matters "related" to bankruptcy.  In re Boone, 52 F.3d 958, 960 (11th Cir. 1995).  It goes without saying that the state law tort claims in this case do arise out of the bankruptcy code.  Therefore, a bankruptcy court could properly have jurisdiction only if the matters are "related" to bankruptcy.  Claims are "related," however, only "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the estate."  Matter of Lemco, 910 F.2d 784, 788 (11th Cir. 1990).  The court notes that the plaintiff's tort claims, even if successful, will not have an effect on duties and obligations of the Main Line defendants' estate.   Regardless of what happens here,  the

plaintiff's claims are based on Florida law, the privilege is not applicable.

16

defendants will still be obligated to pay the $522,000. Consequently, these proceedings are not "related," and there is no bankruptcy jurisdiction over these claims.

The defendants' argument that a bankruptcy court's express retention of jurisdiction is controlling is unpersuasive. For support, the defendants quote Eastman Kodak Co. v. Atlanta Retail, Inc., 2005 WL 4827390 (N.D. Ga. 2005), "A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization." However, that case has been reversed by the Eleventh Circuit Court of Appeals in In re Atlanta Retail, Inc., 456 F.3d 1277 (11th Cir. 2006), which found that a creditor's fraud claims were entirely separate from the underlying bankruptcy proceeding. Further, the defendants' reliance on In re Hardy, 97 F.3d 1384 (11th Cir. 1996), and Pereira v. First North American National Bank, 223 B.R. 28 (N.D. Ga. 1998), is misplaced. Both cases involved claims of violating a bankruptcy court's orders and a bankruptcy court's contempt jurisdiction. As much as the defendant would like this court to construe the plaintiff's claims as nothing more than contempt claims, it is clear that they go well beyond that. The claims before this court arise solely from the defendants' conduct after the bankruptcy and adversary proceedings

17

were effectively concluded.  And the plaintiff does not seek merely an enforcement of the bankruptcy court order or a finding that the defendants are in contempt of that order.  Therefore, the case law in In re Hardy and Pereira to that effect are of no help.

### The Plaintiff's Claims Are Not Actionable in Tort

The Main Line defendants also assert that the plaintiff's claims are not actionable in tort because they are essentially based on a simple breach of contract.  The one case cited for support that is relevant to a bankruptcy proceeding is Thompkins v. Lil' Joe Records, Inc., 476 F.3d 1294 (11th Cir. 2007).  In Thompkins, the court affirmed summary judgment against the plaintiff because although he alleged fraud, his claim was entirely based on breach of contract claims.  476 F.3d at 1316 ("Thompkins complains about nothing more than that Luke Records and Weinberger did not fulfill their promises under the contract--exactly the basis for a breach of contract claim.").

The defendants argue that just as the plaintiff's claims for fraud in Thompkins were insufficiently pled, so too are CMS' claims.  However, Thompkins asserted fraud based on the conduct of those who were not a party to his action, and he could not show any particular evidence that would tend to prove the defendants ever acted in such a way that could amount to fraud.  Thompkins, 476

18

F.3d at 1316.   In stark contrast, the plaintiff in this case alleges numerous particular instances of fraud on the part of the defendants, and it does not allege fraudulent behavior on the part of anyone not a party to this action.

Moreover, the fraud alleged in      Thompkins   was that the defendant had promised the plaintiff he would receive royalties for his musical records.   The Eleventh Circuit noted that even if the record supported such a claim, an allegation of fraud under Florida law "cannot be premised on a promise to do something in the future except where the promise is made without any intention of performing or made with the positive intention not to perform." Thompkins, 476 F.3d at 1316 (internal quotes and citation omitted). Because Thompkins had failed to make any showing that the defendants never intended to pay the royalties, the court concluded that his claim was without merit.

In this case, however, CMS' claim of fraud against the Main Line defendants alleges that the defendants entered into agreements promising to pay but "had no intention to perform their duties." [First Amended Complaint, Doc. No. 16, ¶48.] Thus, CMS' claims are actionable in tort because it alleges precisely the type of tort claim that Florida allows when the injury stems from a failure to

19

perform a promise. Therefore, the plaintiff's claims are actionable in tort.

### The Plaintiff's Claims Are Insufficiently Pled

The defendants next assert that the plaintiff's claim are insufficient because there is no fiduciary duty in a debtor-creditor relationship and because a claim of fraud cannot be grounded on a mere promise to do something in the future.

The defendants' motion to dismiss the complaint for failure to state a claim is pursuant to Rule 12(b)(6), which requires dismissal where the defendant has shown that the plaintiff cannot prove any set of facts in support of his claims which would entitle him to relief. See Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1057 (11th Cir. 2007). Upon reviewing the defendants' motion, this court views the complaint in a light most favorable to the plaintiff and accepts all of the allegation as true. Id.

First, the defendant argues that Count I of the complaint, breach of fiduciary duty on the part of all of the defendants, cannot stand because there is no fiduciary duty between a debtor and creditor. In support, the defendants cite Strong v. Wachovia Bank of Georgia, N.A., 215 Ga. App. 572, 573 (1994). However, that case is not relevant to the circumstances before this court because the debtor and creditor in Strong were not involved in or subject

to a bankruptcy court order.   Those parties were merely in a business relationship well outside of the special duties imposed by the bankruptcy code.

Throughout the bankruptcy proceeding, the Main Line corporation remained the debtor in possession of the bankruptcy estate.  As the debtor in possession of its own assets, Main Line assumed the responsibilities of a trustee over its estate toward its creditors and, consequently, also assumed the corresponding fiduciary obligations.   Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 358, 355-56 (1985).  This is especially true where a debtor is left in possession of its estate, as Main Line was here, because that decision "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee."  Id. (quotations omitted).  Indeed, the bankruptcy code even expressly states that a debtor in possession shall perform the duties of a trustee.  11 U.S.C.A § 1107(a).  Accordingly, the defendants' arguments that they, as debtors, had no fiduciary responsibility to the plaintiffs, as creditors, is simply not true because that relationship arose out of the defendants' bankruptcy.

Next, the defendants assert that Count II, the fraud claim, is insufficient because it does not specify which of the Main Line

defendants represented that $522,000 would be placed in a separate, segregated account and because the plaintiff cannot show a justifiable reliance on any representations.   To sufficiently establish a fraud claim,[5] a plaintiff has to show (1) a false representation by the defendant, (2) knowledge that the representation was false, (3) intent to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by the plaintiff.[6]

The complaint clearly alleges that the defendants falsely represented that they would and had placed funds in a separate, segregated account, that they knew it was false when they made those representations, that they relied on those representations to engage in an agreement, and that it was justifiable reliance. [Amended Complaint, Doc. No. 16,   ¶¶ 46-53.]   The complaint specified certain instances of misrepresentation, such as Noe

_____

[5]Again, the parties cite to different state law--the defendant refer to Florida law and plaintiff refers to Georgia law.   While this court does not decide that issue here, it notes that the elements of fraud are substantially the same under either law and concludes that the plaintiff's claim for fraud would survive a motion to dismiss in either forum.

[6]The court also notes that the Georgia definition of fraud apparently includes an element of damages while the Florida definition does not.   Cf. Pyle v. City of Cedertown, 240 Ga. Ap. 445, 447 (1999), and Cohen v. Dravit Estate Buyers, Inc., 843 So. 2d 989, 991 (Fla. 4th DCA 2003).   That difference is of no moment here, however, because it is axiomatic that any tort claim must prove damages to be successful.

Santamarina's July 26, 2006, affidavit, which states that Main Line had made disbursements according to its reorganization plan, and the Main Line defendants' express agreement to place the funds in a separate, segregated account.  If the plaintiff can prove the facts alleged, it is clear that it would be entitled to relief. Therefore, its claim of fraud is sufficiently pled.

The defendants' argument that the plaintiff cannot demonstrate justifiable reliance would require this court to weigh the evidence, which is improper to do when considering a motion to dismiss.  It is enough at this stage to conclude that, assuming the alleged facts are true, the plaintiff has sufficiently stated claims upon which it may be entitled to relief.  Lastly, because the defendants do not allege that Counts III-VIII are insufficient, this court does not consider those claims here.

<u>Personal Jurisdiction Over Noe and Carolee Santamarina</u>

The defendants lastly assert that this court lacks personal jurisdiction over the Main Line Corporation's two officers, Noe and Carolee Santamarina, because they are not residents of Georgia and were not extensively involved in Main Line's bankruptcy proceedings.  To properly exercise personal jurisdiction, this court looks first to Georgia's long-arm statute to determine whether exercise of personal jurisdiction over a non-resident is

23

proper.   Pursuant to O.G.C.A. §9-10-91, this court may exercise personal jurisdiction over a non-resident tortfeasor who (1) transacts any business within Georgia, (2) Commits a tortious act within Georgia, or (3) Commits a tortious injury in Georgia that is caused by an act outside of the state and the tortfeasor (a) regularly does or solicits business in Georgia, (b) engages in persistent course of conduct, or (c) derives substantial revenue from goods or services in this state.

The Main Line defendants argue that while personal jurisdiction over the Main Line Corporation itself is proper, this court may not exercise jurisdiction over its two officers, Noe and Carolee Santamarina, because "activities of an officer on behalf of a corporation do not confer jurisdiction over the officer individually." [Defs.' Mem. in Supp. of Mot. to Dismiss, Doc. No. 20-2, 22 (quoting Chemtall, Inc. v. Citi-Chem, Inc., 992 F. Supp. 1390, 1402 (S.D. Ga. 1998).] However, while that may be true, it is also well-established that when an officer is hiding behind the corporate veil, has participated in a tort himself, or has directed his corporation to commit a tort, a court may exercise personal jurisdiction over the officer.   Chemtall, 992 F. Supp. at 1402.

In this case, Carolee Santamarina is alleged to have personally participated in a tort on behalf of the corporation by

24

filing a false affidavit with the bankruptcy court. [Amended Complaint, Doc. No. 16, ¶47.]   Also, Noe Santamarina, as the president of Main Line and the only person able to act on Main Line's behalf, is alleged to have personally participated in every false representation and intentional failure to perform Main Line's obligations. [Doc. No. 16, ¶47-48.] Accordingly, the plaintiff has sufficiently alleged that Noe and Carolee Santamarina have personally participated in tortious activity on behalf of the Main Line Corporation.

It is undisputed that the Main Line Corporation has regularly engaged in business in Georgia, and there is sufficient evidence in the record to show that Noe and Carolee Santamarina have personally derived substantial revenue from this state.   Therefore, the plaintiff has established a prima facie case that Noe and Carolee Santamarina, as Main Line's officers, have personally participated in the alleged tortious activity and that exercising personal jurisdiction over them is proper.

**BERGER SINGERMAN'S MOTION TO DISMISS**

The other defendant, Berger Singerman ("Berger"), asserts that this court lacks personal jurisdiction over it because Georgia's long-arm statute does authorize jurisdiction, and because it could

not conspire with its client such that Georgia's "conspiracy theory" of jurisdiction would be inapplicable.

The plaintiff has included Berger Singerman in nearly all of its tort claims against the Main Line defendants.  Because only one of those claims alleges a civil conspiracy, this court must first determine whether Berger Singerman, as an independent party to this action, is subject to personal jurisdiction via Georgia's long-arm statute.  The amended complaint clearly alleges tortious acts that occurred in Florida but caused injury in Georgia.  Consequently, Georgia's long-arm statute permits exercise of personal jurisdiction only if the tortfeasor (a) regularly does or solicits business in Georgia, (b) engages in persistent course of conduct, or (c) derives substantial revenue from goods or services in this state. O.G.C.A. § 9-10-91(3).

The amended complaint makes no attempt to distinguish Berger from its client, and in so doing has utterly failed to establish that Berger is properly subject to personal jurisdiction in this forum.  The plaintiff has made no showing that Berger Singerman regularly conducts business in Georiga, has engaged in a persistent course of conduct in this state, or otherwise derives substantial revenue in this state.  Indeed, tacitly admitting the paucity of evidence showing Berger's contacts with Georgia, the plaintiff asks

26

for jurisdictional discovery to determine whether in fact Berger is properly before this court.

The pleadings show that Berger Singerman served only as Main Line's bankruptcy counsel in Florida. Once that proceeding terminated, Berger's relationship with its client also ended. There is nothing to show that Berger Singerman has or regularly represents clients in Georgia or otherwise engages in any other activity in this state. For its part, Berger Singerman has shown that only two of the firm's attorneys are licensed to practice law in Georgia, yet neither has done so in relation to Berger's business, and Berger Singerman apparently engages in very little, if any, business in Georgia. Accordingly, this court concludes that exercise of personal jurisdiction over Berger Singerman pursuant to Georgia's long-arm statute is not warranted.

Admitting as much, the plaintiff relies almost entirely on Georgia's "conspiracy jurisdiction" under Rudo v. Stubbs, 221 Ga. App. 702 (1996). In that case, the court established that exercise of personal jurisdiction over non-resident defendants may be proper based only on their involvement in a conspiracy. "[T]he in-state acts of a resident co-conspirator may be imputed to a non-resident co-conspirator to satisfy jurisdictional requirements under some circumstances." Rudo, 221 Ga. App. at 703. Before determining

whether to extend Georgia's long-arm jurisdiction over Berger based on its alleged involvement in a conspiracy, however, it is necessary to first decide whether Berger could have conspired with its client.

This court notes that in both Florida and Georgia, an agent cannot conspire with its principal as long as the agent is acting within the scope of his duty. Richard Bertram, Inc. v. Sterling Bank & Trust, 820 So. 2d 963, 966 (Fla. 4th DCA 2002); Nalley Northside Chevrolet, Inc. v. Herring, 215 Ga. App. 185, 188 (1994). As there is no allegation that Berger Singerman acted outside the scope of its duties as bankruptcy counsel, and did not personally benefit from the alleged conspiracy, this court concludes that personal jurisdiction over Berger Singerman is improper.

In response to this argument, the plaintiff asserts that Berger Singerman, as bankruptcy counsel, occupied a special position and had a fiduciary duty with respect to the bankruptcy estate. This special duty, according to the plaintiff, necessarily meant that Berger Singerman's relationship with its client went well beyond that of a typical agent-principal relationship, and so Berger Singerman cannot enjoy the protection from conspiracy allegations against a principal that the law normally affords an agent. However, the plaintiff points to no case, and this court

has found none, that imposes such a special duty on bankruptcy counsel. Although it is clear that a debtor in possession has a fiduciary duty, see Commodity Futures, 471 U.S. at 355-56 (1985), that duty does not extend to the debtor's counsel.[7]

Therefore, because this court concludes that Berger Singerman could not have conspired with its client, extending personal jurisdiction over it on the basis of an alleged conspiracy alone would not be proper. Consequently, this court need not address whether the "conspiracy jurisdiction" rule set forth in Rudo v. Stubbs would apply. Here, there could be no conspiracy between Berger and its client, and so no "conspiracy jurisdiction" may attach.

---

[7]The defendant correctly points out that additional cases cited by the plaintiff to support its proposition that a debtor's counsel also bears a fiduciary duty are inapposite. In re Witney Place Partners, 147 B.R. 619 (N.D. Ga. 1992)(court considered whether to impose sanctions on debtor's attorney); In re Bohack Corp., 607 F.2d 258 (2d Cir. 1979)(grounds for disqualification of counsel for debtor in possession); In re Doors and More, Inc., 126 B.R. 43 (Bankr. E.D. Mich. 1991)(appointment of attorney under Chapter 11).

**CONCLUSION**

The Main Line defendants' Motion to Dismiss [Doc. No. 20] is

DENIED.   Berger Singerman's Motion to Dismiss [Doc. No. 19] is

GRANTED.

SO ORDERED, this _10th_ day of May, 2007.


ROBERT L. VINING, JR.
Senior United States District Judge