FILED IN CHAMBERS
U.S.D.C. Rome

NOV 0 2 2007

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CLOUGH MARKETING SERVICES, INC., | |
| Plaintiff, | CIVIL ACTION |
| v. | NO. 1:07-CV-0173-RLV |
| THE MAIN LINE CORPORATION, NOE SANTAMARINA, CAROLEE SANTAMARINA, | |
| Defendants. | |

## O R D E R

This matter is again before the court on the plaintiff's Motion to Reopen the Case and Enforce the Settlement Agreement [Doc. No. 37]. Upon the parties' request, this court had referred this case to a magistrate judge for mediation. On June 15, 2007, Judge Baverman conducted a mediation in which the parties reached an agreement to settle their dispute. Pursuant to that settlement agreement, this court administratively closed the case on June 19, 2007, and dismissed the action without prejudice pending a motion by either side to reopen within sixty days. The plaintiff has timely moved this court to reopen the case, declare the defendant in breach of the settlement agreement, and enter judgment against the defendant. For the foregoing reasons, the plaintiff's motion is DENIED.

**FACTUAL BACKGROUND**

At the end of the mediation on June 15, 2007, counsel for the parties appeared before Judge Baverman for a settlement conference wherein the court announced the terms of the settlement agreement on the record. [Defs.' Resp. to Mot. to Reopen, Ex. A, Settlement Conference Tr., Doc. No. 38-2.]("Settlement Conf. Tr.") The agreement provided for the defendants to pay a total sum of $750,000, which was to be made up in the following manner:

(1) a credit of $225,359.29 already received by the plaintiff from various garnishment actions;

(2) $202,100 from a transfer of a certain parcel of real property in St. Lucie, Florida (the "property"), unless the defendants obtained two certified appraisals of the property within thirty days, in which case the assigned value of the property would be the average of the two appraisals;

(3) $150,000 payment to the plaintiff by July 31, 2007;

(4) payment by November 1, 2007, of the settlement amount balance, $172,540.71, which was to be adjusted downward if the assigned value of the transferred property, as shown by the average of the defendants' two appraisals, was higher than $202,100;

(5) if defendants failed to make any payment in a timely fashion pursuant to this schedule, the plaintiff would be entitled to a consent judgment of $1,000,000.

[Settlement Conf. Tr., 2-3.]

The defendants timely conducted two certified appraisals of the property. Those two appraisals, the Benjamin and McLaughlin appraisals, valued the property at $470,000 and $390,000 respectively. By averaging the two appraisals, the defendants calculated the assigned value of the property at $430,000 instead of the original figure of $202,100. Thereafter the defendants timely transferred the property to the plaintiff via warranty deed.

On July 31, 2007, the defendants timely paid $150,000 to the plaintiff. Included with that payment was a letter asserting that as of that date the defendants had fully complied with the terms of the settlement agreement. The defendants figured they had met the terms of the settlement agreement by adding their original credit of $225,359.29 and $430,000 for the newly assigned value of the property, plus the July 31 payment of $150,000, which totaled $805,359.29, thus actually exceeding the settlement amount of $750,000.

The settlement conference also placed a duty upon the parties to generate a written settlement agreement. In an attempt to

3

comply, the parties exchanged draft agreements but never formally executed a written settlement agreement until after the defendants had performed the terms agreed upon at the settlement conference. The final draft of the agreement that was ultimately signed by the plaintiff on August 20, 2007, was sent to him by the defendant nearly two months earlier, on June 28, 2007. [Pl.'s Mot. to Reopen, Ex. K, 85, Doc. No. 37-2.]

In the intervening period, the defendants performed their obligations according to the schedule set forth in the settlement conference, which required appraisal and transfer of the property to be completed by July 15 and the $150,000 payment to be made by July 31. In the defendants' letter of July 31, in which they asserted full payment of the settlement amount had been completed, they also demanded that the plaintiff execute the written agreement that it had received over a month earlier. Three weeks later, the plaintiff executed the written settlement agreement on the same day it filed this motion.

## MOTION TO REOPEN CASE, ENFORCE SETTLEMENT AGREEMENT, AND ENTER JUDGMENT AGAINST THE DEFENDANTS

The plaintiff asserts, among other things, that the defendants have breached the settlement agreement by failing to obtain two certified *general* appraisals of the property and that the

appraisals were delivered in bad faith because they were defective. The plaintiff's argument is that the defendants breached the terms of the written agreement while the defendants contend that only the terms announced before Judge Baverman are binding and that their performance complied with that earlier agreement.

The construction and enforcement of a settlement agreement are governed by state contract law. Blum v. Morgan Guar. Trust Co. of New York, 709 F.2d 1463, 1467 (11th Cir. 1983). Under Georgia law, a settlement agreement must meet the same formation and enforceability requirements as other contracts. Ruskin v. AAF-McQuay, Inc., 284 Ga. App. 49, 51-52 (2007). A contract is not formed until the parties agree to all essential terms. O.G.C.A. § 13-3-2. Because the law favors enforcement of a compromise, a settlement agreement is generally enforced "unless the parties clearly failed to reach an agreement on an essential contract term." Ruskin, 284 Ga. App. at 52.

The first issue before the court is whether the settlement agreement reached by the parties before Judge Baverman (the Baverman Agreement) constituted a legally enforceable contract. Notably, the Baverman Agreement requires only certified appraisers, not certified **general** appraisers. [Settlement Conf. Tr., 2, 13.] The basis of the plaintiff's motion is the fact that the defendants

5

did not obtain their two appraisals of the property by "certified *general* appraisers" as required in section 2(A) of the written agreement. The plaintiff contends that only the written agreement of August 20 contains the binding terms of the parties' settlement and that no enforceable agreement existed until the written agreement was executed. In response, the defendants assert that the Baverman Agreement, announced on June 15, contains the only controlling terms of their agreement since the plaintiff did not assent to the written agreement until after the defendants had satisfied their settlement obligations. Thus, the issue is whether the earlier Baverman Agreement constitutes a legally enforceable settlement agreement.

Having carefully reviewed the evidence and the transcript of the settlement conference held before Judge Baverman, this court concludes that the essential terms of the settlement were agreed upon by the parties at the June 15 mediation and, therefore, an enforceable settlement agreement existed at that time. Before announcing the terms and schedule of the agreement, the court cautioned the parties:

> THE COURT: I will announce what I believe the terms of the settlement agreement are, give you all an opportunity to correct me, to make sure that I've filled everything in, and then I'm going to ask every one of you whether or not this is the agreement, whether you've been forced

      into the agreement and whether you are authorized to enter into the agreement.

[Settlement Conf. Tr., 2, 13.] Judge Baverman then explained the terms of the settlement, as noted above, that the defendants would pay $750,000, to be made up by a credit of $225,359.29, $202,100 for the transfer of the property, which could be raised if the defendants obtained two certified appraisals and then averaged them to establish the property's assigned value, $150,000 payment by July 31, and a payment of the remaining balance by November 1. He also announced a default provision providing for a consent judgment of $1,000,000 if the defendants failed to timely make their payments.

    Subsequently, the parties discussed mutual releases, responsibility for drafting legal documents, and confidentiality of the settlement agreement. The parties also spent a considerable amount of time discussing with Judge Baverman the framework for a written consent order and how its confidentiality would be affected if an enforcement action were necessary, as well as the procedure for pursuing such an enforcement action. [Settlement Conf. Tr., 2-11.]

    At one point, counsel for the plaintiff raised two issues before the court. First it attempted to clarify the exact figures

7

for the payments already received from the garnishment actions that were to be credited toward the overall $750,000. After defense counsel responded, the court eventually interjected, "You all can figure out the numbers. You don't need me to be doing that." To which counsel for plaintiff responded, "Absolutely." [Settlement Conf. Tr., 12.]

Second, and important for the analysis here, counsel for plaintiff then inquired about the details of the defendants' option to obtain two appraisals and then average them to get a new assigned value of the property:

> Mr. Merolla: . . . And in terms of the appraisers, are the defendants going to be picking two appraisers, or is it one and one, and how do we want to handle that?
>
> Mr. Nohr: They don't know any appraisers in St. Lucie County and if that's the agreement, we can pick them -- do you want to pick one there, too?
>
> Mr. Merolla: I just spoke to somebody -- I have another client that's in Port Charlotte, and when we were on one of our breaks, I talked to him and I think I can get my hands on an appraiser.
>
> Mr. Nohr: Well, I mean, we don't want it to be anyone that we have a relationship with or that you have a relationship with.
>
> Mr. Merolla: Okay. I mean, I'm just saying.
>
> The Court: If they're paying, they should be able to pick them.
>
> Mr. Merolla: That's fine with me.

> The Court: They're going to be certified and have to be in the area.
>
> Mr. Nohr: Certified and in the area. All right. That's it.
>
> The Court: All right, any other terms that we didn't talk about?
>
> Mr. Nohr: No, you honor.

[Settlement Conf. Tr., 12-13.]

Subsequently, Judge Baverman specifically asked Mr. Clough, in his capacity as owner of the plaintiff, Clough Marketing Services, Inc., whether he was authorized to enter into the settlement on behalf of the plaintiff, to which Mr. Clough replied, "Yes, Sir." The court also asked about the extent to which it had discussed the terms of the settlement agreement:

> The Court: And have we discussed all the material terms of the settlement of this on behalf of Clough Marketing Services, Inc.?
>
> Mr. Clough: Yes, Sir.

[Settlement Conf. Tr., 13-14.]

Judge Baverman then turned to the plaintiff's counsel, Mr. Merolla, and asked him about the extent to which they had discussed the agreement:

> The Court: And have we discussed all of the material terms of the settlement of this litigation?
>
> Mr. Merolla: Yes, we have.

9

> The Court: And are you authorized to enter into this settlement on behalf of Clough Marketing Services, Inc.?
>
> Mr. Merolla: Yes, I am.

[Settlement Conf. Tr., 14.]

Next, Judge Baverman made the same inquiries of the defendants and Mr. Nohr, counsel for the defendants. Each responded in the same manner, that the discussions before Judge Baverman constituted the terms of the settlement agreement. Judge Baverman then proceeded to allow the parties an opportunity to speak regarding the terms of the announced settlement agreement, to which no party responded, and thereupon the conference was concluded. [Settlement Conf. Tr., 14-18.]

Taking the transcript as a whole, the court finds nothing showing that either party did not agree to some essential term of the settlement. To the contrary, the entire settlement conference appears to have been intended to put on the record the material terms of the agreement reached during mediation. The transcript itself clearly provides details of the payment terms, conditions of performance, binding timelines, and penalties for breach. Moreover, each party expressly confirmed that the terms announced by Judge Baverman constituted the "material terms" of the agreement. Consequently, this court concludes that the parties

10

agreed to the material terms of their settlement at the June 15 mediation; and, therefore, an enforceable settlement agreement existed at that point.

Having thus concluded that the parties had an enforceable agreement, the court turns to the plaintiff's assertion that the defendants breached the settlement agreement by not obtaining two "certified *general* appraisals" of the property. It is undisputed that at least one of the defendants' appraisals, specifically the McLaughlin appraisal, was done by a "certified *residential* appraiser" and not a "certified *general* appraiser."[1] However, the Baverman Agreement did not require "certified general appraisals." In fact, nothing in the transcript from the settlement conference shows any distinction between the two types of appraisals. Rather, the Baverman Agreement merely specifies that the defendants' appraisals must be delivered by two "certified appraisers" and does not further delineate whether they must be obtained from a "certified *residential* appraiser" or a "certified *general* appraiser." Indeed, after Judge Baverman announced this

---

[1]The court notes the difference between a certified "residential" and "general" appraiser is one of degree, the "general" appraiser being a higher level distinction because of increased education and experience requirements as well as the ability to issue appraisals on any type of real property and not just residential property.

11

particular term of the agreement, counsel for the plaintiff engaged in a discussion to clarify the conditions on the appraisers but did not dispute or ask for clarification when the court elucidated the precise requirements for obtaining appraisals, "[t]hey're going to be certified and have to be in the area." [Settlement Conf. Tr., 13.]

Accordingly, the defendants did not breach the settlement agreement by not obtaining two certified "general" appraisals. The terms as set forth in the Baverman Agreement clearly require only that the appraisals be delivered by "certified appraisers," and it did not impose an additional obligation to ensure that the appraisals were done by "certified general appraisers" instead of "certified residential appraisers." In this case, the defendants obtained two "certified" appraisals and thereby complied with the terms of the settlement agreement.

While it is true, as the plaintiff contends, that section 2(A) of the written agreement executed on August 20 required the higher standard of "certified general appraisers," that is of no moment here. As of June 15, the enforceable agreement between the parties had no such heightened requirement; it merely required a "certified

12

appraiser," and any alleged failure to meet that higher standard does not constitute a breach.[2]

Apart from the argument that the defendants breached the agreement by not obtaining two "certified general appraisers," the plaintiff also asserts that, in any event, the two appraisals that were tendered were done in bad faith and therefore cannot be considered as effective performance by the defendants.

With respect to the Benjamin appraisal, the plaintiff argues that it was not tendered in good faith because it comprised an opinion focused on delivering to the defendants a sales price negotiation estimate instead of an opinion on the fair market value of the property. The plaintiff contends that this amounts to bad faith because "the purpose of the appraisal mechanism was to allow the Defendants the opportunity to transfer the Property at fair market value in the event the 2006 tax appraisal of $202,100 was inaccurate." [Pl.'s Mot. to Reopen, 9, Doc. No. 37.]

However, the plaintiff points to nothing in the record that establishes this purported purpose for the appraisal option. Judge

---

[2]Although the issue is not decided here, this court doubts that the August 20 written agreement itself constituted a binding agreement. For example, all but one of the dates established as a deadline for the defendants' performance preceded the date on which the agreement was executed.

13

Baverman did not express the purpose of the appraisal mechanism. He merely stated the agreement's term that provided for establishing the assigned value of the property ($202,100) and the defendants' option to increase that value if certain conditions were met, i.e., obtain two certified appraisals. The term of the Baverman Agreement establishing the appraisal mechanism did not specifically require a market value opinion. Additionally, the supervising appraiser involved in the Benjamin appraisal, Harry Gray, has proffered a declaration that the appraised value of the property reflects fair market value. Given these facts, this court cannot conclude that the Benjamin appraisal amounted to bad faith dealing.

With respect to the McLaughlin appraisal, the plaintiff asserts that it is not valid because Mr. McLaughlin certified that he analyzed three recent sales when in fact he used only two. According to the plaintiff, such a false certification by the appraiser is a violation of the Uniform Standards of Professional Appraisal Practice (USPAP) standards. Pursuant to USPAP Standards Rule 2-1, an appraisal report must "clearly and accurately set forth the appraisal in a manner that will not be misleading." [Pl.'s Reply in Supp. of Mot. to Reopen, Decl. of Daniel D. Fuller, Ex. B, 8, Doc. 39-2.] The plaintiff's argument is that such a

14

false certification is a misleading statement and that a misleading statement invalidates the appraisal.

However, taken as a whole, this court cannot conclude that the McLaughlin appraisal is not a competent appraisal or is otherwise woefully deficient under the applicable standards. First, there is apparently no actual requirement under the USPAP standards to rely on three recent sales. Second, it is not the case that Mr. McLaughlin analyzed only two properties while his report indicates three were used. Although the appraisal report indicates reliance on at least three recent sales, the actual configuration of outside properties used was two sales and two listings. Accordingly, it remains true that at least three properties were used to develop the report; it is just that the nature of each property is inaccurate. Lastly, the first paragraph of the Appraiser's Certification, which has the relevant "minimum of three recent sales" language, appears to be boilerplate language that obviously was not corrected by Mr. McLaughlin to reflect the fact that he based his appraisal on two comparable sales and two current listings instead of at least three comparable sales. Consequently, this court concludes that despite the apparent error in the McLaughlin report, it nevertheless does not rise to the level of being "misleading." Therefore, the McLaughlin report is valid.

**CONCLUSION**

For the foregoing reasons, the plaintiff's Motion to Reopen the Case and Enforce the Settlement Agreement [Doc. No. 37] is DENIED. The defendants' pending Motion to File a Surreply Brief [Doc. No. 40.] is GRANTED. Although in the court's view the plaintiff's conduct in this case approaches being unreasonable and overly litigious, the defendants' request to impose sanctions under 28 U.S.C.A § 1927 is DENIED at this time. Having concluded that the Baverman Agreement constituted an enforceable settlement agreement and that the defendants have complied with the terms of that agreement, the court DISMISSES this case with prejudice.

SO ORDERED, this 2nd day of Nov., 2007.

ROBERT L. VINING, JR.
Senior United States District Judge